# United States Court of Appeals for the Eighth Circuit

WILLIAM COUSER AND SUMMIT CARBON SOLUTIONS, LLC.,

*Plaintiffs-Appellees*,

v.

SHELBY COUNTY, IOWA, ET AL.

*Defendants-Appellants*.

WILLIAM COUSER AND SUMMIT CARBON SOLUTIONS, LLC.,

*Plaintiffs-Appellees*,

v.

STORY COUNTY, IOWA, ET AL.

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of Iowa
The Honorable Stephanie M. Rose
Nos. 22-cv-00020-SMR and 22-cv-00383-SMR

**AMICUS BRIEF IN SUPPORT OF APPELLANTS'
PETITION FOR REHEARING EN BANC**

Dated: July 10, 2025

Caroline A. Flynn
Hana Vizcarra
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 667-4500
cflynn@earthjustice.org
hvizcarra@earthjustice.org

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eighth Circuit Rule 26.1A, Counsel for the Pipeline Safety Trust certifies that the Pipeline Safety Trust is a non-profit corporation incorporated in the State of Washington. The Pipeline Safety Trust has no parent corporation, and no publicly held corporation owns stock in the Pipeline Safety Trust.

Dated: July 10, 2025

*/s/ Caroline A. Flynn*
Caroline A. Flynn

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF AMICUS CURIAE ........................................................... 1

INTRODUCTION .................................................................................. 2

ARGUMENT ........................................................................................ 3

    I.  By Inquiring Into The Motivation Underlying The Local Ordinances, The Panel Went Beyond The Express Terms Of The Pipeline Safety Act's Preemption Clause And Contravened Guidance From The Supreme Court .................................................................................. 3

    II.  Federal Preemption Of State And Local Pipeline-Routing Regulation Is An Issue Of Exceptional Importance ............................................ 10

CONCLUSION .................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

*Cipollone v. Liggett Group, Inc.*,
  505 U.S. 504 (1992)......................................................................... 4

*National Meat Ass'n v. Harris*,
  565 U.S. 452 (2012)......................................................................... 8

*Oklahoma v. Castro-Huerta*,
  597 U.S. 629 (2022)......................................................................... 6

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie*,
  608 F.3d 200 (5th Cir. 2010). ........................................................ 4

*Virginia Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019)..................................................... 5, 6, 7, 8, 11, 12

*Washington Gas Light Co. v. Prince George's Cty. Council*,
  711 F.3d 412 (4th Cir. 2013). ........................................................ 4

**Statutes**

49 C.F.R. pts. 190-99 ........................................................................ 3

49 U.S.C. § 60102(a)(1)-(2). .............................................................. 3

49 U.S.C. § 60102(a)(2) ................................................................ 3, 5

49 U.S.C. § 60102(i) .......................................................................... 3

49 U.S.C. § 60104(c) ................................................................. 3, 4, 7

49 U.S.C. § 60104(e) .............................................................. 3, 4, 7, 11

Ark. Code § 14-17-209(a)(4). ......................................................... 11

Iowa Code § 335.5(1) ...................................................................... 11

Minn. Stat. § 462.357 ...................................................................... 11

**Rules**

Fed. R. App. P. 29(b)(2) .................................................................... 1

Fed. R. App. P. 40(b)(2)(B) .............................................................. 6

Fed. R. App. P. 40(b)(2)(D). ........................................................... 10

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024) ............................................................... 5

Pipeline Safety Trust, *Carbon Dioxide Pipeline Safety* (2023)
    https://pstrust.org/wp-content/uploads/2023/05/CO2-Pipeline-Safety-Summary.pdf ................................................................................................. 1

Pipeline Safety Trust, *H2/CO2 One Page Fact Sheet* (2024)
    https://pstrust.org/wp-content/uploads/2024/10/H2CO2-One-Page-Fact-Sheet.pdf ................................................................................................. 12

# INTEREST OF AMICUS CURIAE[1]

The Pipeline Safety Trust (Trust) is a non-profit watchdog of the pipeline industry and its regulators. The Trust's mission is to promote pipeline safety through education, advocacy, and partnerships with residents, government, and industry—resulting in safer communities and a healthier environment.

The Trust has developed expertise in legislative and regulatory strategies surrounding pipeline development. Its research and advocacy clearly show that local land-use regulations are critical tools for protecting the public from the consequences of pipeline incidents. *See, e.g.*, Pipeline Safety Trust, *Carbon Dioxide Pipeline Safety* 3 (2023), https://pstrust.org/wp-content/uploads/2023/05/CO2-Pipeline-Safety-Summary.pdf. The Trust accordingly has encouraged governments to be proactive in approaches to pipeline-failure prevention to protect the families, institutions, and businesses located around pipeline infrastructure.

The Trust disagrees with the panel's ruling that federal law preempts the county ordinances at issue—in particular, the setback requirements. The panel's interpretation of the Pipeline Safety Act is fundamentally misguided and

---

[1] The Trust has sought leave to file this brief under Federal Rule of Appellate Procedure 29(b)(2). No party authored any part of this brief and no person other than the Trust and its counsel contributed any funds for its preparation or submission.

1

Appellate Case: 23-3758     Page: 6     Date Filed: 07/17/2025 Entry ID: 5538121

threatens serious harm to communities living and working alongside proposed pipelines.  The Court should reconsider the case en banc.

## INTRODUCTION

Shelby and Story Counties in Iowa have exercised their traditional police powers to enact zoning laws requiring carbon dioxide pipelines to be located at prescribed distances from cities, parks, farms, and buildings.  Such setback ordinances are quintessential local rules governing pipeline location, which the federal Pipeline Safety Act expressly carves out from the Act's jurisdictional scope.  In a split decision, the panel nonetheless deemed those measures barred by the Supremacy Clause, on the rationale that the ordinances must have been motivated by safety objectives and therefore qualify as pipeline "safety standards" falling within the Act's preemption provision.  The panel majority's focus on the counties' motivations—rather than the inherent characteristics of the setback ordinances themselves—contravenes Supreme Court precedent.  And by denying state and local governments the ability to give more than secondary consideration to safety concerns in making pipeline-routing decisions, the panel decision means that *no* government, at any level, will do so.  That was not Congress's intent in enacting the Pipeline Safety Act.  En banc review is warranted to correct this clear error of law and its profoundly destabilizing effects.

2

# ARGUMENT

I. **By Inquiring Into The Motivation Underlying The Local Ordinances, The Panel Went Beyond The Express Terms Of The Pipeline Safety Act's Preemption Clause And Contravened Guidance From The Supreme Court**

1. The PSA aims to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities" by requiring the Secretary of Transportation to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities." 49 U.S.C. § 60102(a)(1)-(2); *see id.* § 60102(i). Those include standards covering "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." *Id.* § 60102(a)(2). The Pipeline and Hazardous Materials Safety Administration (PHMSA) administers the PSA and issues the relevant federal safety standards. *See* 49 C.F.R. pts. 190-99.

The PSA has an express preemption provision applicable to interstate pipelines: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c). However, the PSA expressly disclaims federal jurisdiction over the *location* of pipelines, stating that the statute "does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility." 49 U.S.C. § 60104(e).

3

The PSA thus preserves state and local authority over the location and routing of pipelines. PHMSA recognized as much in a memorandum submitted in connection with the pipeline project under review here. As the agency explained, because "there is no . . . federal agency that determines siting of . . . carbon dioxide pipelines," the "responsibility for siting new carbon dioxide pipelines rests largely with the individual states and counties through which the pipelines will operate and is governed by state and local law." App. 914; 22-cv-00020 R. Doc. 78-1, at 16.

2. "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992). Because Congress has expressly identified the preempted area, courts should not ask whether other areas are implicitly covered. *See id.*; *see also Washington Gas Light Co. v. Prince George's Cty. Council*, 711 F.3d 412, 422 (4th Cir. 2013).

The fundamental question in this case is therefore whether the county setback requirements are "safety standard[s]" within the meaning of Section 60104(c)—and thus preempted—or laws governing the "location or routing" of pipelines within the meaning of Section 60104(e)—and not preempted. *See Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 211 (5th Cir. 2010). They are the latter. The setback laws do not impose standards

4

governing the "design," "installation," "inspection," "testing," "operation," or "maintenance" of pipeline facilities. 49 U.S.C. § 60102(a)(2). Instead, they amend county land-use regulations, *see* App. 273; 22-cv-00020 R. Doc. 59-2, at 5 (Shelby County); App. 1088; 22-cv-00383 R. Doc. 30-3, at 2 (Story County), and dictate *where* a pipeline may be located, set in terms of physical distance from various geographic areas, features, or structures, *see* App. 279-80; 22-cv-00020 R. Doc. 59-2, at 11-12 (Shelby County); App. 1094; 22-cv-00383 R. Doc. 30-3, at 8 (Story County).

The setback requirements thus "fit comfortably within a local land use ordinance." Op. 19 (Kelly, J., dissenting); *cf.* Setback, *Black's Law Dictionary* (12th ed. 2024) (setbacks are "[t]ypically contained in zoning ordinances"). And as PHMSA has affirmed, "[n]othing in the federal pipeline safety law impinges on the[] traditional prerogatives of local . . . government" over "land use, including setback distances." App. 916; 22-cv-00020 R. Doc. 78-1, at 18; *cf. Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 768 (2019) (plurality opinion) (relying on federal agency's understanding of the scope of its statutory authority in preemption analysis). Indeed, PHMSA has observed that localities commonly impose setbacks on pipeline infrastructure. App. 916; 22-cv-00020 R. Doc. 78-1, at 18.

3. In nonetheless concluding that setback ordinances here constitute impermissible "safety standards," the panel majority focused not on the inherent features of the ordinances themselves, but instead on the counties' "motivation" in enacting them. Op. 8 (citations omitted); *see* Op. 7 (explaining that the court would "look[] beyond the rationale offered to evidence of the law's purpose"). In the panel majority's view, because the setback requirements were likely motivated by safety concerns and would have the "direct and substantial effect" of furthering safety objectives, the ordinances are federally preempted. Op. 8 (citation omitted).

As the counties' petition correctly explains (Pet. 10-14), this approach to preemption analysis is ill-conceived, inadministrable, and contrary to controlling Supreme Court precedent. *See* Fed. R. App. P. 40(b)(2)(B). In the preemption context—as elsewhere—the Supreme Court "ha[s] long warned against undertaking potential misadventures into hidden state legislative intentions without a clear statutory mandate for the project." *Virginia Uranium*, 587 U.S. at 776 (plurality opinion); *see id.* at 787-89 & n.2 (Ginsburg, J., concurring in the judgment) (agreeing that an inquiry into a state legislature's motivation is generally inappropriate in preemption analysis). As the Court emphasized again recently, "[t]he Supremacy Clause cannot be deployed to elevate abstract and unenacted legislative desires above state law." *Oklahoma v.*

6

*Castro-Huerta*, 597 U.S. 629, 642 (2022) (internal quotation marks and citation omitted).

Here, no statutory mandate to undertake an extratextual foray into legislative intent exists: Nothing in the PSA suggests that Congress intended the phrase "safety standard[]" to encompass location or routing provisions that are motivated by or address safety concerns. If it were otherwise, then the preemption provision in Section 60104(c) would swallow the carve-out for location and routing rules in Section 60104(e). As Judge Kelly explained in dissent, "[zoning] ordinances are typically, and understandably, driven by multiple concerns, including economic, environmental, and safety." Op. 19. And Congress would not have expected the mine-run of location and routing rules regarding hazardous-material pipelines to be largely agnostic about safety.

Interpreting the PSA's preemption provision to turn on the degree to which an otherwise unobjectionable local law was motivated by a safety concern introduces the kind of subjectivity and uncertainty that should play no role in a statutory-interpretation inquiry of any kind, let alone one determining whether local governments may exercise their traditional police powers. *See Virginia Uranium*, 587 U.S. at 776-77 (plurality opinion) (detailing the "well-known conceptual and practical [concerns]" underlying attempts to divine a multi-member legislative body's intention).

7

As the petition explains (at 13), the panel majority provided no guidance on how to draw the line between a setback requirement that furthers safety goals "incidental[ly]" (which the panel considered permissible) or "substantial[ly]" (impermissible). Op. 8. That vague benchmark "risk[s] subjecting similarly situated persons to radically different legal rules as judges uphold and strike down materially identical state regulations based only on the happenstance of judicial assessments of the 'true' intentions lurking behind them." *Virginia Uranium*, 587 U.S. at 775-76 (plurality opinion). Moreover, the panel majority's approach encourages state and local governments to mask the extent to which safety plays a role in the legislative process or other decision-making (like permitting), to the detriment of informed policymaking and political accountability. *See id.* at 775.

4. Even if some kind of limited inquiry into motivation or effect were appropriate—such as to verify that the counties are not circumventing the PSA by recasting a quintessential safety standard as a location rule, *cf. National Meat Ass'n v. Harris*, 565 U.S. 452, 463-64 (2012)—the panel's methodology here was clearly improper. Evidence in the record showed that the counties' setback requirements were substantially motivated by and designed to serve other typical land-use planning goals in addition to safety.

8

For instance, the Shelby County ordinance was the outgrowth of a citizen petition and public comments stressing the need to regulate pipelines to promote the local economy, protect future development in the area, and maintain property values. *See* App. 285-95, 340-58; 22-cv-00020 R. Doc. 59-2, at 17-27, 72-90. The Shelby County planning and zoning commission—which recommended the ordinance to the county Board of Supervisors—likewise explained that the law was intended to address three primary concerns: (1) protection of the health, safety, and welfare of residents living near the pipeline route and to preserve existing and future uses of land and structures; (2) the negative effect a pipeline in close proximity to existing structures could have on property values and tax revenues; and (3) the stifling of future growth and development in areas adjacent to the route. App. 386-90; 22-cv-00020 R. Doc. 59-2, at 118-22. Similarly, the Story County ordinance preamble states that the setback requirements are consistent with the county's strategic plan for preserving its "rural character" and are intended to preserve "existing rural residential development," to "ensure orderly growth and development," and to "address social, economic, and environmental concerns related to conflicts between different uses of land." App. 1091; 22-cv-00383 R. Doc. 30-3, at 5.

The panel did not consider any of this, nor cite anything in either ordinance's legislative record, in uncovering what the majority believed to be

9

the counties' "primary motivation." Op. 8 (citation omitted). Instead, the panel reasoned that because the setback provisions "apply alike to economically developed and remote areas," the counties could not have had "aesthetic, land-use, and development rationales." *Id.* But that does not follow. Story County, for instance, designed its setback requirements to maintain the rural nature of unincorporated portions of the county. *See supra* p. 9; *see also* Pet. 15-16. The panel also considered it probative that the ordinances require larger setbacks from certain kinds of buildings, like homes, churches, and schools. Op. 8. But requiring a pipeline to remain a certain distance from homes, schools, and other community institutions undoubtedly advances economic and aesthetic goals alongside safety ones. *See, e.g.*, App. 253; 22-cv-00020 R. Doc. 59-2, at 10 (Shelby County ordinance explaining that setback requirements are meant, *inter alia*, "to preserve existing infrastructure and future development, and to maintain property values").

## II. Federal Preemption Of State And Local Pipeline-Routing Regulation Is An Issue Of Exceptional Importance

In addition to flouting precedent and common sense, the panel's decision threatens to destabilize pipeline-safety regulation more broadly. *See* Fed. R. App. P. 40(b)(2)(D).

The panel's invalidation of any pipeline-siting law that has more than an "incidental," "[in]direct," or "[in]substantial" effect on safety, Op. 8, sweeps

10

well beyond setback requirements. The panel's analysis would threaten any local *or state* zoning or permitting determination that considers safety as a key factor. *See* Pet. 14 ("If counties cannot regulate based on safety concerns, then state authorities like the Iowa Utilities Commission can't either."). Indeed, Iowa state law requires local governments to use their zoning authority "to secure safety" from "dangers." Iowa Code § 335.5(1). It is not clear whether such legally mandated consideration of safety—which could certainly be characterized as more than an incidental factor—renders all zoning decisions concerning pipelines in Iowa federally suspect under the panel's test.[2]

Even more troublingly, the panel failed to "consider what would follow from [its] interpretation" of the PSA: a regulatory vacuum. *Virginia Uranium*, 587 U.S. at 770 (plurality opinion). Again, the PSA is clear that PHMSA has no authority to prescribe pipeline locations or routes. 49 U.S.C. § 60104(e). And according to the panel, state and local governments have no authority to prescribe pipeline locations or routes if those governments are substantially motivated by safety considerations. But the idea that Congress wanted *no*

---

[2] Iowa is not alone in this regard. *See, e.g.*, Ark. Code § 14-17-209(a)(4) (authorizing counties to zone for "matters as are necessary to the health, safety, and general welfare"); Minn. Stat. § 462.357(1) (authorizing municipalities to zone for "the purpose of promoting the public health, safety, morals, and general welfare").

11

government to meaningfully rely on safety factors in siting a carbon-dioxide pipeline "seems more than a little unlikely." *Virginia Uranium*, 587 U.S. at 771 (plurality opinion).

As PHMSA has recognized, "[e]ach community affected by an existing or proposed pipeline faces unique risks." App. 917; 22-cv-00020 R. Doc. 78-1, at 19. Carbon dioxide has unique physical characteristics that can be extremely dangerous upon a pipeline rupture:

- It is an asphyxiant, which can either kill or cause long-term health effects in both humans and animals.

- It is odorless and colorless, which makes detection difficult.

- It does not ignite or disperse quickly, which means that it can travel far away from the pipeline after a rupture and settle.

- Dense-phase carbon dioxide (the kind the pipeline at issue would carry) undergoes rapid phase changes upon a rupture, which can exacerbate the rupture size and cause large amounts to swiftly release into the environment.

Pipeline Safety Trust, *H2/CO2 One Page Fact Sheet* 1 (2024), https://pstrust.org/wp-content/uploads/2024/10/H2CO2-One-Page-Fact-Sheet.pdf.

The location of pipeline infrastructure is thus of critical importance—and not just for economic or aesthetic reasons. PHMSA has been clear that because "a pipeline release can impact individuals, businesses, property owners, and the environment, it is important that *all stakeholders* carefully consider land use and development plans to make risk-informed choices that protect the best interests of the public." App. 917; 22-cv-00020 R. Doc. 78-1, at 19 (emphasis added). The panel's decision forbids exactly that careful deliberation by the governmental bodies closest to affected communities. It should not stand as the law of this circuit.

## CONCLUSION

For the foregoing reasons, the petition for rehearing en banc should be granted.

Dated: July 10, 2025

Respectfully submitted,

*/s/ Caroline A. Flynn*
Caroline A. Flynn
Hana Vizcarra
EARTHJUSTICE
1001 G Street NW
Suite 1000
Washington, DC 20001
(202) 667-4500
cflynn@earthjustice.org
hvizcarra@earthjustice.org

*Counsel for Amicus Curiae*

13

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(b)(4) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 2,597 words.

2. This brief complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in Microsoft Word in double-spaced format using a proportionally spaced typeface in 14-point Calisto MT font.

3. To comply with 8th Cir. R. 28A(h)(2), the brief was scanned for viruses. The brief is virus-free.

Dated: July 10, 2025

*/s/ Caroline A. Flynn*
Caroline A. Flynn

*Counsel for Amicus Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing Amicus Brief In Support Of Appellants' Petition For Rehearing En Banc was electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system on July 10, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 10, 2025

/s/ Caroline A. Flynn
Caroline A. Flynn
*Counsel for Amicus Curiae*